[Cite as *State v. Price*, 2013-Ohio-1542.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 98410

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## CHRISTIAN PRICE

DEFENDANT-APPELLANT

---

### JUDGMENT:
### REVERSED AND REMANDED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-549930

**BEFORE:** Stewart, A.J., Kilbane, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** April 18, 2013

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, OH    44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Aaron Brockler
            Daniel T. Van
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 8th Floor
Cleveland, OH    44113

MELODY J. STEWART, A.J.:

**{¶1}** A jury found defendant-appellant Christian Price guilty of rape, kidnapping, and telecommunications harassment, rejecting his argument that sexual intercourse between him and the victim had been consensual. In this appeal, Price primarily complains that the state impeached him by telling the jury that he did not immediately claim to the police that the sexual intercourse had been consensual, but instead waited until the start of trial to make that claim. He argues that this was an impermissible comment on his post-arrest right to remain silent and that counsel was ineffective for failing to raise the issue at trial. Price also complains that the state knowingly allowed a police detective to give false testimony and that the convictions for rape and kidnapping should have merged for sentencing.

I

**{¶2}** Price questions neither the sufficiency nor the weight of the evidence, so we can state the underlying facts in summary form. The victim and Price knew each other, spoke often on the telephone, and on one prior occasion engaged in consensual intercourse. After that initial sexual encounter, Price told the victim over the course of many telephone conversations and text messages that he was "horny" and wanted to have intercourse with her. The victim found this tiresome, asking him "why do you always have to ask me for sex?" She told him that rather than having sex, they should "spend

some time together." From that point, Price would come over to her house every second or third day, but they did not have further sexual relations. Price did not, however, stop constantly asking the victim to have sex with him.

{¶3} On the day in question, Price stopped by the victim's house. He asked for a hug. She told him "no" in "a playful way," but eventually hugged him. She described this interaction with him as "flirtatious." Price told the victim that he was "horny," and repeatedly tried to persuade her to have sex with him. She refused, saying that she was menstruating. Undeterred, Price picked her up and carried her to her bedroom. Despite her continuing to tell him "no," Price engaged in sexual intercourse with her.

{¶4} Price did not call the victim for three days after the rape. By this time, the victim was experiencing an unusual vaginal discharge, which she later learned was a sexually transmitted infection known as bacterial vaginosis that she contracted from Price. The victim then went to the police and reported the rape.

{¶5} Almost two weeks after reporting the rape, the victim went back to the police station "upset" because she had received numerous telephone calls from Price. A detective who interviewed the victim arranged for her to make a recorded "pretext call" in which she would engage Price in conversation with the hope that he might admit to the rape. During that call, Price, astonished by the accusation, repeatedly denied raping the victim. He did, however, admit that the victim said "stop" and "no," but further stated that "it's not like you said no consistently." He also stated, "you know how many times a girl says, 'no', and then it ends up happening, like * * * 'alright come on'?"

## II

{¶6} Following his arrest by the police, Price was read his *Miranda* rights and told that he had the right to remain silent. Price told the detective that he did not want to talk. In order to "give him the advice as to what was going on and why he was there," the detective read Price the victim's complaint. The detective testified without objection that Price replied that "it didn't happen" and, in the detective's words, wondered "how can somebody just come in here, file a complaint and he gets arrested?" Price also asked whether the detective had proof that he was in the area and suggested that the detective look into the victim's background because she had "mental problems." The state characterized these post-*Miranda* statements as "unsolicited," but Price argues that his statements were the product of a *Miranda* violation and that nothing he said following his invocation of the right to silence contradicted his defense of consent.

## A

{¶7} Price did not object to the detective's testimony, so we must first determine whether the detective's recitation of Price's statements amounted to plain error.

{¶8} An alleged error is plain error only if the error is "obvious," *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240, and "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. We take notice of "plain error" with the "utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus.

B

{¶9} Once a criminal defendant receives the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it is improper for the state to impeach the defendant by causing the jury to draw an impermissible inference of guilt from the defendant's post-arrest silence. *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The rationale behind this rule is that *Miranda* warnings carry the state's "implicit assurance" that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him. *Wainwright v. Greenfield*, 474 U.S. 284, 290-291, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986). Because a defendant's post-*Miranda* warning silence could be nothing more than an invocation of his right to silence, it would be fundamentally unfair to permit a breach of that assurance by allowing impeaching questions as to why the defendant failed to give an exculpatory account to the police after receiving the warnings. *Id.* at 295; *State v. Rogers*, 32 Ohio St.3d 70, 71, 512 N.E.2d 581 (1987).

{¶10} The rule in *Doyle* does not apply where "no governmental action induce[s] the defendant to remain silent," *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982). So pre-arrest silence may be used for impeachment purposes because the state has done nothing to induce the defendant to believe that he has a right to remain silent before arrest. *Jenkins v. Anderson*, 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980). The same applies to post-arrest, pre-*Miranda* warning, silence,

*Fletcher*, 455 U.S. at 605-607, and any voluntary post-*Miranda* warning statements. *Anderson v. Charles*, 447 U.S. 404, 408-409, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).

C

**{¶11}** Price does not dispute that he made statements to the detective, but claims those statements were the result of a blatant *Miranda* violation and that those statements did not, in any event, contradict his assertion that he and the victim engaged in consensual intercourse.

**{¶12}** Price did not raise the issue of whether his statements to the detective were provoked in violation of *Miranda* in a pretrial motion to suppress those statements, so this argument is waived for purposes of appeal. *State v. Campbell*, 69 Ohio St.3d 38, 44, 1994-Ohio-492, 630 N.E.2d 339.

D

**{¶13}** We next address Price's argument that nothing he said to the police contradicted his assertion that he and the victim engaged in consensual intercourse. When considering this argument, it is important to note that the detective's testimony was not directed toward any contradictions in Price's trial testimony because Price had yet to testify. In *Charles*, the Supreme Court stated:

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda*

warnings has not been induced to remain silent. As to the subject matter of

his statements, the defendant has not remained silent at all.

447 U.S. at 408.

{¶14} In addition, *Charles* found that an out-of-court statement may be called

"inconsistent" with the in-court statement because of a curious omission as well as a flat

contradiction.   The court remarked:

Each of two inconsistent descriptions of events may be said to involve

"silence" insofar as it omits facts included in the other version. But *Doyle*

does not require any such formalistic understanding of "silence," and we

find no reason to adopt such a view in this case.

*Id*. at 409.

{¶15} Put differently, "telling omissions" are a form of inconsistency and once a

suspect agrees to speak he may be questioned about those telling omissions.   *Johnson v.*

*Acevedo*, 572 F.3d 398, 402 (7th Cir.2009).

{¶16} The detective's testimony was not offered to impeach anything that Price

said at trial, nor could it have been given that Price had yet to testify.   It was offered for

no other purpose than to draw meaning from Price's silence.   For example, the detective

testified that it was at trial that he heard for the first time Price's contention that the

intercourse was consensual.   He told the jury that from an "investigatory standpoint,"

Price's consent defense, first being made nearly one year after the rape, caused him to

"look at that as showing that there's a lack of truth in the fact of what he initially said to

what we're defending in court situations." In other words, the detective plainly considered that Price's failure to immediately claim consent, despite having been guaranteed that his silence would not be used against him, made him less honest.

{¶17} In *Jaradat v. Williams*, 591 F.3d 863 (6th Cir.2010), the United States Court of Appeals for the Sixth Circuit considered a similar issue. Jaradat was taken into custody and charged with rape. The police advised him of his *Miranda* rights and a detective testified that Jaradat said that "he would prefer to have an attorney present with him before he made a statement." *Id.* at 867. The following exchange ensued between the assistant prosecuting attorney and the detective:

> Q. Now, when you speak to a defendant, is that his or her opportunity to tell you his or her side of the story?
>
> [Defense counsel]: Objection, objection.
>
> The Court: Overruled.
>
> A. Yes, there's two sides to every story, and we want to hear both sides.
>
> Q. At any time on December the 29th, did the defendant ever advise you that any type of sexual contact, any type, took place between him and the victim?
>
> A. No, he didn't.
>
> * * *
>
> Q. I'm sorry. At anytime during your conversation with the defendant, did he admit to you or tell you that any type of sexual contact whatsoever took place between him and the victim?
>
> A. He did not.

*Id.* at 867-868.

**{¶18}** The Sixth Circuit found those questions "amount to blatant *Doyle* violations" because they were "a direct comment on [Jaradat's] post-arrest silence." *Id*. at 868.

**{¶19}** The same rationale applies here. The questions asked of the detective were designed to draw attention to Price's post-arrest silence by equating that silence with guilt. Indeed, the detective's testimony left no doubt about this conclusion given the vacuity of his statement that Price's failure to immediately raise a consent defense made Price inherently suspect — if Price did not raise the issue of consent until trial, the police could not have thought him inherently untruthful at the time they were investigating the rape. In any event, Price was under no obligation to give the state any advance notice that he was raising a defense of consent. *Cf. State v. Pepin-McCaffrey*, 186 Ohio App.3d 548, 2010-Ohio-617, 929 N.E.2d 476, ¶ 33 (7th Dist.) (no rule requiring defendant to provide notice of affirmative defense of self-defense or defense of property).

**{¶20}** Apart from the obvious defects in the detective's testimony was the suspect nature of his testimony that Price's consent defense was raised for the first time at trial. The detective listened in on, and recorded, Price's conversation with the victim in the "pretext call." The recording contains Price's repeated denials that he had raped the victim, making it plain that Price believed he and the victim engaged in consensual intercourse. For the detective to testify that the first time he heard the theory of the sexual encounter being consensual was "[a]s we were coming into court" was a wholesale disregard of the call's content.

**{¶21}** By referencing Price's raising the defense of consent for the first time at trial, the detective's only purpose in testifying was to draw attention to that silence. So not only did the state violate the guarantee that Price's silence could not be used against him, but it used that silence against him by suggesting that he was lying by raising a consent defense on the eve of trial. This is a clear case where the state exploited a suspect's silence under *Doyle*.

E

**{¶22}** The state argues that Price waived his silence by making voluntary comments after he stated that he did not wish to talk. It maintains that it could introduce Price's failure to mention corroborating facts of his defense. Price does not dispute that he made statements to the police, but claims that these statements were inadmissible because they did not contradict a theory of consent.

**{¶23}** Statements voluntarily made after the *Miranda* warnings have been given to a defendant are admissible in evidence. *See State v. Osborne*, 50 Ohio St.2d 211, 364 N.E.2d 216 (1977) (a "garrulous" defendant who chooses to talk has not relied on any inherent *Miranda* promises with respect to what he talks about).

**{¶24}** If we assume without deciding that the detective could legitimately testify to Price's post-*Miranda* statements, we nonetheless must conclude that the testimony was erroneously allowed because the state did not intend to exploit the inconsistencies in what Price said, but rather to exploit what he did not say. In reaching this conclusion we note that the post-*Miranda* waiver of the right to remain silent "does not mean that any time a

defendant makes any post-arrest statement the door is open to full cross-examination about the defendant's failure to recount the exculpatory trial story earlier. *Miranda* protections apply equally to refusals to answer specific questions." *Grieco v. Hall*, 641 F.2d 1029, 1034 (1st Cir.1981).

{¶25} Price was not garrulous. The detective said that Price said only three things after stating that he did not wish to speak: "it didn't happen," "can you even prove that I was in the area?" and "did you check into [the victim's] background?" Nothing in these statements was necessarily inconsistent with a theory of consensual sexual intercourse.

{¶26} Even if these statements might conceivably have been interpreted as stating an alibi, it is plain that the state did not use those statements to impeach Price, but used them for the purpose of exploiting his silence. The detective's testimony was that Price's defense of consent, coming out for the first time at trial nearly one year after he and Price first spoke, showed "there's a lack of truth in the fact of what he initially said to what we're defending in court situations." The import of this statement was to highlight Price's silence in the face of a rape accusation. As in *Jaradat*, this was a clear *Doyle* violation.

F

{¶27} The final inquiry in our plain error analysis is whether but for the error, the outcome of the trial clearly would have been otherwise.

{¶28} The evidence against Price was not strong. The victim testified that she did not want to have intercourse with Price because she was menstruating, although she

admitted that she had been flirtatious with him when he came over to her house, despite knowing that he was "horny." And while it is true that Price acknowledged during the course of the "pretext call" that the victim had initially said "no" to intercourse, it is equally true from the course of that conversation that he believed he eventually prevailed upon her to give in to his advances. This served as a plausible explanation to his comments that "it's not like you said no consistently" and "you know how many times a girl says, 'no' and then it ends up happening, like * * * 'alright come on'?" In fact, Price consistently denied raping the victim throughout the telephone call, even expressing disbelief that she could make such an accusation against him. Tellingly, Price did not know that the conversation was being recorded or that the victim had filed a complaint against him, so the statements he made during the course of the conversation could certainly be viewed as credible. And when the victim reported the rape, admittedly it was after Price failed to call her and she began to suspect that she had contracted a sexually transmitted disease from him.

{¶29} Against these facts was the detective's testimony that Price's failure to immediately raise a defense of consent made Price inherently untrustworthy. This testimony permeated the trial to the point where it became a focus of the state's closing argument. The assistant prosecuting attorney told the jury that Price:

> * * * never told [the detective] not one time this was a consensual sexual encounter shortly after that occurred. Not until he comes into court today does he say this is consent. Says that everything was great, good [on the date of the offense].

> Ten days of silence that I just mentioned.

**{¶30}** This argument forced defense counsel to address the matter in closing argument and rebut the state's inference that Price's silence at the time of arrest somehow suggested that the consent defense was a last second trial strategy. On that point, the state in its rebuttal argument referenced Price's "new theories" and that "[w]hen he had a chance to talk about it a month after the incident he doesn't mention any of that."

**{¶31}** Given the absence of any direct evidence proving the rape, arguments directed toward Price's "silence" during the interview with the detective undoubtedly led to Price's conviction. Comments on Price's silence cast him as a liar and an opportunist, and were so pervasive that but for them being made, the outcome of the trial would have been different.

**{¶32}** We therefore find that Price has established plain error, so we sustain the first assignment of error, reverse his convictions, and remand for a new trial. Our resolution of this assignment of error necessarily moots consideration of the second assignment of error that counsel was ineffective for failing to object to the state's comment on Price's silence. Also mooted is Price's claim of prosecutorial misconduct and the court's failure to merge the sentences for kidnapping and rape. Price did not challenge any aspect of his conviction for telephone harassment, so that conviction stands.

**{¶33}** This cause is reversed and remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MELODY J. STEWART, ADMINISTRATIVE JUDGE

MARY EILEEN KILBANE, J., and
PATRICIA ANN BLACKMON, J., CONCUR